**Gandhi GUTTA, Plaintiff–Appellant,**

v.

**STANDARD SELECT TRUST INSURANCE PLANS, Defendants–Appellees.**

No. 06–3708.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 2007.

Decided June 26, 2008.

Mark D. DeBofsky (argued), Daley, Debofsky & Bryant, Chicago, IL, for Plaintiff–Appellant.

W. Sebastian von Schleicher (argued), Michael J. Smith, Smith, von Schleicher & Associates, Chicago, IL, for Defendants–Appellees.

Before RIPPLE, MANION, and WOOD, Circuit Judges.

WOOD, Circuit Judge.

Dr. Gandhi Gutta, a laparoscopic surgeon, suffers from a variety of physical ailments. In August of 2000, he came to the conclusion that he could no longer work in his chosen profession and filed for disability benefits under a group policy with Standard Select Trust Insurance Plans (Standard). Gutta received disability benefits from Standard for two years. At that point, in order to be eligible for continuing benefits under the plan, he had to show not just that he was unable to perform his own occupation, but that he was unable to perform *any* gainful occupation for which he is suited by education and experience. Standard continued to pay benefits to Gutta for a third year while it investigated his eligibility under the latter, more stringent, criterion. It ultimately decided that Gutta was ineligible for continuing benefits because he was capable of working as a Medical Director.

After exhausting his administrative appeals, Gutta filed suit in district court and moved for summary judgment. He first argued for a favorable standard of review, claiming that the policy does not grant the plan administrators enough discretion to warrant deferential review, and so he was entitled to the *de novo* standard. He further claimed that even using the more deferential "arbitrary and capricious" standard, the Plan's determination was unreasonable, and therefore arbitrary and capricious.

Standard likewise moved for summary judgment on Gutta's claim; it also filed a counterclaim for restitution of $73,996.75, nearly all the disability benefits that it had paid to Gutta. Standard took the position that Gutta had not been entitled to that sum, because its policy contains an offset provision for benefits received from other group insurance plans. Gutta acknowledged receiving benefits from another

plan, but he claimed that it was not a group plan and therefore was not subject to the offset provision.

Finally, Gutta also asked the district court to enforce what he claimed to be a binding settlement agreement, but the court declined to do so, finding that the parties did not reach a meeting of the minds. The court granted summary judgment in Standard's favor on Gutta's claim as well as on Standard's counterclaim, and Gutta now appeals both adverse decisions.

## I

We provide here the facts pertinent to the questions whether the district court was correct to apply the deferential "arbitrary and capricious" standard of review to Standard's decisions and whether it correctly rejected Gutta's assertion that the parties had concluded an enforceable settlement agreement. The facts bearing on Gutta's medical conditions and Standard's assessment of his eligibility for disability benefits are thoroughly discussed in the district court's opinion and need not be repeated here. See *Gutta v. Standard Select Trust Ins.*, No. 04 C 5988, 2006 WL 2644955, at *1–12 (N.D.Ill. Sept.14, 2006).

Gutta's Group Policy with Standard contains a section titled "ALLOCATION OF AUTHORITY," which reads as follows:

> Except for those functions which the Group Policy specifically reserves to the Policyowner or Employer, Standard has *full and exclusive authority to control and manage* the Group Policy, to administer claims, and to *interpret* the Group Policy and *resolve all questions arising in its administration, interpretation, and application.* Standard's authority includes, but is not limited to:
>
> 1. The right to *resolve* all matters when a review has been requested;

> 2. The right to *establish and enforce* rules and procedures for the administration of the Group Policy and any claim under it;
>
> 3. The *right to determine:*
> a. *Eligibility* for insurance;
> b. *Entitlement* to benefits;
> c. *Amount* of benefits payable;
> d. *Sufficiency and the amount of information* we may reasonably require to determine a., b., or c., above.
>
> Subject to the review procedures of the Group Policy *any decision Standard makes in the exercise of our authority is conclusive and binding.*

(Joint Apx., Ex. A, Group Policy, Amendment 8, p. 2) (emphasis added).

As is true in most litigation, from time to time as this case progressed there was some talk of settlement. Gutta focuses on an exchange of emails that took place on June 1, 2005, to support his claim that the parties reached an enforceable agreement. On that day, Standard sent Gutta an email stating:

> Standard's position is that Dr. Gutta is indebted to it in the amount of $73,996.75, hence, Standard's Motion to File its Counterclaim. In other words, Standard's "response" is that it declines Dr. Gutta's offer to settle for its payment to him of $25,000, but Standard would, at this time, entertain resolution of all disputes existing between it and Dr. Gutta on the basis of a "walk-away" whereby each party foregoes prosecution of any further claim against the other under the terms of the Policy and otherwise.

Gutta's lawyer sent an email in response stating, "Given the current posture of the case, your 'offer' is accepted." On June 5, 2005, Standard then submitted a draft settlement agreement containing additional terms, which Gutta refused to sign.

## II

On the cross-motions for summary judgment with respect to Gutta's claim, appellate review is *de novo*. *Sound of Music Co. v. 3M*, 477 F.3d 910, 914 (7th Cir.2007). Similarly, we review *de novo* the grant of summary judgment in favor of Standard on the counterclaim. Adjudication of these claims, however, was proper only if the parties did not have an enforceable settlement agreement.

■■■ A legally binding settlement agreement is a contract, and so it is governed by ordinary principles. Gutta relies on Illinois law to support his argument, without objection from Standard, and so we too will look to that body of substantive law. From a procedural standpoint, however, federal law governs whether a judge or jury resolves any disputed issues. *Mayer v. Gary Partners and Co.*, 29 F.3d 330, 332–33 (7th Cir.1994). When the basic facts are not in dispute, the question whether a contract has come into being is one of law. See *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir.1997). If there are disputed facts, FED.R.CIV.P. 56 governs the question whether summary adjudication is permissible or if a trial is necessary.

In *Laserage Technology Corp. v. Laserage Labs.*, 972 F.2d 799 (7th Cir.1992), we reviewed the requirements that Illinois imposes on contract formation in a situation similar to the one we face here:

> A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally. Here, we look to Illinois contract law for guidance. In interpreting a contract under Illinois law, "the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement." ... Illinois follows the objective

theory of intent. As a result, whether [the parties] had a "meeting of the minds" as to security for the purchase of Mr. Byrum's Laserage shares is determined by reference to what the parties expressed to each other in their writings, not by their actual mental processes.

*Id.* at 802 (citations omitted). If a potential jury could reach only one conclusion about the existence of a meeting of the minds between Gutta and Standard, then the district court had no reason to explore the issue further.

■■ The district court found that the statement in the email that Standard "would 'entertain' the idea of a 'walkaway' type of settlement [was] not a binding agreement to enter into a settlement agreement containing no terms other than a mutual promise for the parties to dismiss their ˙respective complaint and counterclaim." The court interpreted the statement to mean "precisely what it says it is: an agreement to come to the table to talk about the parameters of an agreement which is premised on both sides walking away as opposed to one side paying the other side some amount of money." *Id.* It found no genuine dispute over the fact that there was "no meeting of the minds as to an agreement whereby the parties would, without more, dismiss their claims." *Id.*

Given the language in the email exchange and the fact that the draft settlement agreement of June 5 (an agreement Gutta rejected) contained three full pages of new terms, *id.* at 53–55, we too see nothing that might give rise to a material dispute of fact. There was no meeting of the minds here, and therefore no enforceable settlement contract came into being. We may thus proceed to the review of the district court's rulings on the motions for summary judgment.

## III

■ On the merits, this case largely turns on whether the language of the Standard plan gives the administrator discretion in determining benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When discretionary power is conferred on the administrator, her decision is reviewed under the arbitrary and capricious standard, *id.* at 111, 109 S.Ct. 948, and the district court may consider only evidence that was before the administrator in deciding whether her decision passes muster. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 n. 1 (7th Cir.1996).

■ The reservation of discretion must be communicated clearly in the language of the plan, but the plan need not use any particular magic words. See *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 331 (7th Cir.2000). Indeed, "the critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to *shape the application, interpretation, and content of the rules in each case.*" *Diaz v. Prudential Ins. Co. of Am.,* 424 F.3d 635, 639 (7th Cir.2005) (emphasis added).

■ Although Standard's plan does not use the word "discretion," it uses a variety of equivalent terms that convey the same meaning. See *supra* ("full and exclusive authority to control and manage, ... to administer, ... and to interpret and to resolve all questions arising in its adminis-

tration, interpretation, and application"; "[t]he right to determine [e]ligibility [and] entitlement"; "any decision Standard makes in the exercise of our authority is conclusive and binding"). This is a far cry from the spare language "when Prudential determines" and "satisfactory to Prudential" that this court found inadequate to signal discretion in *Diaz,* 424 F.3d at 638, 640. The Standard plan's language unambiguously communicates the message that payment of benefits is subject to Standard's discretion. Gutta argues unconvincingly that the language "Standard has authority ..." does not confer discretion but instead merely establishes that Standard operates the plan rather than some other actor. But that is not the only language in the Plan. Reading it as a whole, as we must, we conclude that Standard's plan "gives the employee adequate notice" that Standard has the "latitude to shape the application, interpretation, and content of the rules in each case." See *id.* at 639–40. Thus, we will review Standard's determination deferentially, to ensure that the ultimate decision was not arbitrary, and we will not consider evidence outside the record that was before the administrator.

■ The district court exhaustively reviewed the medical evidence that was before the administrator. It summarized the testimony of no less than twelve doctors, as well as a few other people. Gutta had been diagnosed with the following conditions: type I diabetes, macular degeneration, retina artery aneurism in the left eye with a residual blind spot, dislocation of the left thumb, degenerative arthritis in both wrists, ulnar palsy of the left arms and hand, rotator cuff injury in the left shoulder, and degenerative arthritis in the right AC joint. Standard accepted the fact these problems left Gutta unable to continue working as a surgeon, but it found that he had never offered persuasive

evidence showing that he could not perform other activities in the medical field. Standard took note of the fact that a number of experts believed that Gutta was capable of performing full-time sedentary to light-level work. It also observed that he had 10½ years' experience in administrative positions, that he had owned and operated a medical practice for over 20 years, and that he had some administrative experience in hospitals. All this added up, in its view, to the conclusion that Gutta had the essential skills to become a medical director or assistant medical director.

Gutta attacks these findings, and it is possible that we might have found more to criticize if we were conducting *de novo* review. But we are not. The district court, we conclude, reasonably concluded that Standard's decision was "based upon substantial evidence because it is consistent with the medical evidence in the record" and "thus easily satisfies the 'arbitrary and capricious' standard of review." See *Gutta v. Standard Select Trust Ins.*, 2006 WL 2644955, at *23.

## IV

■ Turning to Standard's counterclaim, we must begin with the threshold question whether the district court had jurisdiction over it. ERISA preempts state-law theories of recovery. *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 410 (7th Cir.2004). If Standard's counterclaim can properly be viewed as seeking "equitable relief" under 29 U.S.C. § 1132(a)(3), then jurisdiction is secure, because in that case it would arise under ERISA and would fall within federal question jurisdiction. Gutta, however, argues that because the benefits Standard paid him have been commingled with his other assets or dissipated, tracing is impossible, and thus equitable relief is unavailable. This means, in his view, that the counterclaim in substance is now just a state-law claim for damages, outside the scope of ERISA.

The case of *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006), controls our analysis. Marlene Sereboff and her husband were injured in a car accident, and her employer paid their medical expenses pursuant to an ERISA plan. *Id.* at 1872. The plan contained an "'Act of Third Parties'" provision, which "require[d] a beneficiary who 'receives benefits' under the plan for such injuries to 'reimburse [Mid Atlantic]' for those benefits from '[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise).'" *Id.* (altered by the Court). The Sereboffs did in fact recover tort damages from a third party, and Mid Atlantic pursued reimbursement of the benefits it paid the Sereboffs, bringing an action under 29 U.S.C. § 1132(a)(3). *Id.* at 1873. The question before the Court was whether the relief Mid Atlantic sought was truly "equitable" for purposes of § 1132(a)(3). The Court held that it was and that the reimbursement provision in the plan created an "equitable lien by agreement." *Id.* at 1877. For the latter kind of lien (in contrast to "an equitable lien sought as a matter of restitution"), strict tracing of the funds to be recovered was not required. *Id.* at 1875. The Court noted also that "the fund over which a lien is asserted need not be in existence when the contract containing the lien provision is executed." *Id.* at 1876.

In our case, Standard's plan provides for an offset for "Income From Other Sources": "Each month your Maximum LTD [Long Term Disability] Benefit will be reduced by the Income From Other Sources for the same monthly period...." As the parties note, the relevant part of the definition of "Income From Other Sources" refers to "[t]he amount you receive or are eligible to receive because of

your disability under any group insurance coverage, other than group credit insurance or group mortgage disability insurance."

The plan further provides that the beneficiary "must notify Standard of the amount of the Income From Other Sources when it is approved." If the beneficiary "ha[s] been overpaid, Standard will notify [the beneficiary] of the amount of the overpayment" and the beneficiary "must immediately reimburse Standard for the amount of the overpayment."

Standard's reimbursement provision is indistinguishable from the reimbursement provision in *Sereboff*, 126 S.Ct. at 1872. Here, too, there is an "equitable lien by agreement" between Standard and Gutta, and that lien is not dependent on the ability to trace particular funds. Standard may bring its counterclaim under 29 U.S.C. § 1132(a)(3) even if the benefits it paid Gutta are not specifically traceable to Gutta's current assets because of commingling or dissipation.

■ Even if all this is correct, Gutta maintains that he ought to prevail based on several defenses to the counterclaim. First, he claims that because he disclosed to Standard that he was receiving benefits from a policy that he obtained through his membership in the American Medical Association (AMA) with Sentry Life Insurance Company, the benefits paid by Standard were "voluntary payments" made "with full knowledge of the facts." The district court found, to the contrary, that the "record does not show that Standard Select knew that the AMA plan *was group insurance* and voluntarily chose to pay benefits." *Gutta v. Standard Select Trust Ins.*, 2006 WL 2644955, at *27 (emphasis added). On appeal, Gutta does not contest this finding. Instead, he argues that Standard's ignorance is irrelevant, because the burden was on Standard to investigate further.

Aside from a number of policy arguments one could make against it, Gutta's position is contrary to the plain language of the plan, which states that "[Gutta] must notify Standard of the amount of the Income From Other Sources when it is approved." That can mean only that a proper disclosure would also disclose that a given payment was indeed from a group plan, *i.e.*, that it was Income From Other Sources. Otherwise, Gutta could disclose to Standard that he got a check from his grandmother and it would be up to Standard to investigate whether his grandmother was an administrator of a group insurance plan, or an agent of any one of the many payors who might trigger an offset. Thus, the benefits paid by Standard could not properly have been characterized as voluntary.

Gutta's second defense is that because Standard did not exhaust administrative procedures before filing a counterclaim against Gutta, Gutta was denied a full and fair review. Standard's failure to exhaust, according to Gutta, also had the effect of impeding his discovery on the counterclaim. As Standard points out and as the record reflects, however, the district court specifically noted that it was denying discovery only with respect to the original claim and not the counterclaim. The rest of Gutta's discussion on this point revolves around the policy favoring exhaustion.

■ We need not decide whether the same exhaustion requirement that applies to beneficiaries also applies to ERISA fiduciaries. See generally *Reliance Standard Life Ins. Co. v. Smith*, No. 3:05–CV–467, 2006 WL 2993054, at *3 (E.D.Tenn. Oct.18, 2006) (holding that an ERISA fiduciary is not required to exhaust administrative review before bringing an action to recover an overpayment). Enforcement of

an exhaustion requirement is left to the discretion of the district court. *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 401 (7th Cir.1996). The district court adjudicated the counterclaim despite Standard's failure to exhaust administrative review, and Gutta has not shown that this was an abuse of discretion.

 Gutta's final argument is that the disability payments he received from his AMA policy are not subject to Standard's offset provision because the AMA policy is not "group insurance coverage." In his view, the AMA policy is better characterized as franchise insurance. "Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies." *Hall v. Life Ins. Co. of North America*, 317 F.3d 773, 775 (7th Cir.2003). Our own review of the AMA insurance certificate leaves us confident that Gutta's AMA insurance coverage was not an individual policy. The policy was issued to the AMA (the "Holder") under Group Policy No. 90–10613–47. Part V of the certificate contains a "Conversion Privilege," which shows that the AMA policy Gutta possessed was not an individual plan, but merely convertible to an individual plan upon the occurrence of certain events. After examining the various indicia of group policies found in the AMA Certificate, the district court found that the AMA policy was a group policy rather than a franchise policy, and that it therefore fell within the offset provision. After doing likewise, we agree.

\* \* \*

The judgment of the district court is AFFIRMED.